Good morning. May it please the Court. My name is Cori Hong. I'm from the Florence Project. I'm appointed pro bono counsel and I represent Petitioner Hebert Rodolfo Waterhouse, whom I'll refer to as Mr. Waterhouse. I will save two minutes for rebuttal and I will watch my time. I will talk about remand, adverse credibility, and then CAT. On remand, to the government's credit, after I filed my opening brief, the government presented to this Court 49 pages of documents that the BIA and IJ had not considered when evaluating Mr. Waterhouse's claim. Under Chenery, it is the agency that must have the first opportunity to consider the relevance. Isn't this fairly typical in reinstated order cases that there are two administrative records. There's the administrative record for the reinstatement and then for the withholding proceedings before the IJ that go up to the BIA. So what's unusual about this that would warrant a remand? What is unusual is that on the supplemental page 24, there is a notation from 2020, which had no record of Mr. Waterhouse's true identity. This was after we have in the record that his special authorization document was in his true name and that directly goes to the adverse credibility in the CAT claim and corroborates and rebuts the IJ's concern. Well, if you've now found a new document in that portion of the record that you think should have been considered by the IJ and the BIA, isn't the proper procedure to file a motion to reopen before the BIA to ask it to consider that? Well, Your Honor, as an officer of the court, after 20 years of doing this type of work, there's never been anything that relevant that's been in that separate record before that's been segregated from the record. So I would ask, given the unusual circumstances... You haven't answered my question. Why isn't the proper procedural vehicle, if you think there's a new document that's come to your attention that's in the other record for the reinstatement that you think is relevant to the withholding only proceeding, the procedure is to go to the BIA and say, here's a new document which I've discovered and you should reopen proceedings and reevaluate it. That is an alternative remedy, but given that it was presented to the court on appeal, it is in a different, unique posture that the government presented to it. Now, if the court disagrees, I'd like to turn to the adverse credibility finding based on the BIA's reasoning. And the BIA's four reasons are not supported by substantial evidence. Now, the first reason, the BIA affirmed the IJ's finding that, quote, his inability to register his identity in Honduras is implausible. And it referenced the IJ's finding that he has some, if not all, of the necessary documents. This finding ignores that the law, the family law attorney, the aunt, and the expert all explain that a parent must be present to be involved. And so, in this case, not having that dispositive factor. But I think the reaction of the agency was that, do you really mean to suggest that if the parent says, I'm not going to get involved, that there's no possibility to be recognized or get an identification? It's just simply impossible? Your mother has to show up or nothing? That is what the family law attorney in Honduras says. That is what Mr. Bowman, the expert, testified to. That is what the law says itself. And that is what the aunt said. So then orphans can't, or people whose parents have already been deceased, they just can't ever be registered and Honduras has no procedure for doing that? It seems to strain credulity to say something like that. Well, Your Honor, the orphan issue, that's something that the IJ made up on the spot. It's just reflecting, there are lots of situations in which a parent is not capable of showing up. So this insistence that there's no option other than the parent showing up, and if that, then Honduras is not going to give an identification document no matter what the circumstances seems implausible. Your Honor, there are two responses. Kumar says the speculation has to be grounded in evidence. And on the orphan question, most orphans become orphan after their parents, they've already given birth. Their parents die after they've been registered. And even in the United States, in immigration law, orphan is defined as someone who's under 16. There is no showing that Mr. Waterhouse, now in his 30s, is an orphan as defined under Honduran law. And there's no law explaining how orphans are registered differently if in fact they are. So that question about the orphans, complete speculation that the IJ raised on her own without prompting by the DHS, without evidence, that cannot be a basis to find him not credible. What about the basis that he used all of these different aliases? Now, he gives a reason why, at least you indicate in the briefing why. But why isn't that a basis for the IJ to say that he's not credible? Well, there are two responses. The first is that, of course, it's reasonable for a multiple aliases to be in dishonesty. But this court's precedent requires that the IJ explain and there's a cogent rejection for a cogent explanation. And here, the BIA did not give that other than to say, well, he used it for work, so I'm dismissing the fact that he could not obtain other documents. Well, but he used it in different contexts as well. I mean, he used it when he was arrested on several occasions with different names and different aliases. So it wasn't just for work. He used it for a different reason. And unlike every other case cited in the briefing where someone uses a false identity, they're using to hide their true identity. He never had his true identity. That's the crux of this case. Now, if the court disagrees that that alone cannot stand under Kumar, if any of the credibility cases or reasons are rejected under Alam and Kumar, given that they are interwoven here, remand is the proper remedy for the IJ to look at this in its totality. And on remand, the BIA and IJ would also have the benefit of the USCIS stateless memo, which provides and gives context to the fact— So wait, I want to go back to what you said, though. So are you saying that if there are some reasons, though, that the IJ provided, wouldn't that be sufficient to establish substantial basis for affirming their decision? Why is that incorrect? Under Alam and under Kumar, this court has said that there's no longer a bright-line rule that the single factor will uphold an adverse credibility finding. And in Kumar in particular, when the different—I think three of the four reasons—three of the four were rejected, and so that single factor was interwoven to the three that were not substantiated by evidence. So remand is the proper remedy for the IJ to look at it anew. And here, given that orphans was pure speculation, that in itself would be enough to remand for the IJ to kind of rebut whether, you know, her finding that this was completely implausible is actually supported in record. Now, the second reason is that the BIA affirmed that the delay in the removal was not significant because he lacked the Honduran identity documents. However, again, in the special trip authorization permitting his 2008 removal, it wasn't his true name. That's in 853. But then in the reinstated order itself, it also—it never listed his name of Waterhouse, and that's at the supplemental documents at 7. And again, on January 8th, the consulate recorded no documentation or registry of him even after his removal. So that rebuts the concern and corroborates his concern or his claim that they didn't even have regular removal orders the first time around in 2018. The third reason on credibility is that the BIA said there wasn't corroborating evidence that the Honduran government lacks records in his real name. Here, the IJ and the BIA ignored the aunt's second declaration found at 377, where she explained she tried to get a record from the Honduran court confirming that he's not registered, but the only way she could get that record is if the parents participate in that process to confirm that there's no record of his birth, and the lack of parental involvement is the exact reason why he can't register her birth. This, again, Mr. Waterhouse produced school records from sixth grade in his real name at 857, and so then that shows that even though he was there in school under his real name, the aunt was unable to corroborate the lack of registry and prove the omission that the IJ wanted. Under Batardi and Bargsegam, the IJ cannot ignore what's in the record, but has to actually identify an actual record that could corroborate the claim rather than just saying there isn't enough, which is what happened here. On the Kat claim, and then the agency overlooked the objective evidence that supports his claim that he would face future torture, the aunt's declaration is probably one of the most important documents that they overlooked, the family law attorney declaration at AR 384 saying that he can't register, Dr. Borman's testimony at 295 saying there's no way that he knows of how he can register his birth without his parents, and lastly, the Honduran consulate's claim that he still doesn't exist in their records. It's documents that supports the Kat claim. If there are no further questions, may I reserve my remaining time? Yes. Okay. All right, thank you, counsel. All right, so we'll hear now from Mr. Needle. Good morning. May it please the Court, Jonathan Needle, Department of Justice, on behalf of the Respondent. While the factual record in this case is pretty convoluted, the ultimate question for the Court to resolve, that is the question of the petitioner's credibility, is pretty straightforward, where, in this case, the agency thoroughly, comprehensively reviewed the record and explained why the petitioner was not a credible witness. Can you address the last issue that was raised in the last filing about remand? I mean, why isn't it proper for us to then send this back for the IJ, in the first instance, to consider the new document? Right, and we did file a short response to the motion last Friday, but our position is that any argument based on the DHS record should have been raised earlier in the proceedings, where the Court accept the government's motion to submit the record, for permission to submit the record after the deadline, and also the Court's order gave the petitioner an opportunity to either file a supplemental or a substitute opening brief. Well, I understand that's your position, but it's here now, so what's your position? The position is that the documentation in the DHS record to which the petitioner points is basically no different from what was in the Immigration Court record with regard to the petitioner's dishonesty in withholding his, what he claims is his true identity, the name Rodolfo Waterhouse. The argument being made is that the I-213 that DHS generated in January of 2020 contains a notation that the Honduran consulate didn't have any record of this individual in their database, but it's clear from the context of the I-213 that the Honduran consulate was looking up the name Vernardes, and it's clear, the petitioner himself admits that Vernardes was a false name that he used, and so it stands to reason that the Honduran government would not have a record of this person. Now, it is the case that he was removed under the name Waterhouse back in April of 2018. The circumstances of his removal are far from clear, how the Honduran government was able to locate or issue a travel document under that name. There was no indication that before that travel document was issued that the petitioner told the U.S. government that his true name is Rodolfo Waterhouse. It appears from his testimony that the first time that he identified himself by that name was after he was taken into immigration custody, after the stipulated order of removal was passed, and apparently there was some delay in getting travel documents. He was lingering in immigration detention, and so apparently, this is according to the petitioner's testimony, but apparently there was some conversation with the consulate where he divulged this Waterhouse name for the first time, and that is how the government was able to issue its travel documents. So it's unclear why the Honduran government would do that if they did not consider him to be a national of their country, and in fact, the petitioner also testified that as he was returning to Honduras on the removal flight, as he was disembarking at the airport, he was handed birth certificates, copies, certified copies of birth certificates, including one belonging to his biological mother. This was given to him by an official of the government of Honduras. He doesn't explain why he was given these documents, but one can infer that the government was encouraging him to go through the registration process and to obtain the identity documents that he had not received in the past, and so his claim that he's a man without a country, that he has a very attenuated connection to Honduras, is belied by the circumstances of his removal. What's your response to counsel's argument that the IJ relied on speculation and concluding that it was not credible that he could not register in Honduras and get an identity card? Well, the petitioner is basically testifying that he is without any recourse because neither of his parents were willing to participate in that process. That was his testimony, that there was no recourse whatsoever. And that testimony is self-serving, and it's not corroborated by any of the documentary evidence that he submitted. It's not substantial. Counsel claims it's corroborated by the declaration from the Honduran law expert. I would disagree with that characterization. There was no unequivocal statement. If we're referring to the declaration of Ms. Aguilar, there was no statement substantiating the petitioner's claim that he had no recourse. One of the things she said is both parents must present copies of their identity cards, birth certificates, copies of the page. Does that mean that they have to personally show up with the documents? It's far from clear. There is a clearer statement of the law in the document that DHS submitted during the removal proceeding from a foreign law specialist at the Law Library of Congress, where he refers to a specific article of the Honduran code, which provides a list of documents that could be presented, that it's not an exhaustive list. It's not a matter of the petitioner having to provide each and every one of the listed documents, but it allows for some flexibility in what evidence he can present to the authorities. And he had those documents, correct? Well, the record does reflect that he has his mother's birth certificate. He has birth certificates for his aunt, his grandmother. He has school records that were issued in the name of Waterhouse. He has vaccination records. This is all apparent from the petitioner's own evidence. There is a document that the Honduran Registration Authority purportedly issued in July of 2018 acknowledging the fact that the petitioner had submitted these documents. And there is no conclusive statement anywhere in the record, other than the petitioner's own self-serving testimony, that his application was rejected and he has no further recourse. So, the agency acted reasonably in relying on this discrepancy between his testimony and what's reflected in the record. And this is also in addition to his criminal history, which is extensive. What do you make of counsel's argument that under, I think, Kumar, that we, if any one, according to her take, if any one of the bases that the IJ relied on is speculative or not supported by the record, that that is not sufficient? I think that's a misstatement of the holding of Kumar and other cases from this court that deal with that issue. There have certainly been instances where the court has disagreed with certain factors underlying an adverse credibility determination and has determined that because those specific findings weren't supported by substantial evidence, then the proper course is to remand the case to the agency to reconsider the credibility determination. But would one basis be sufficient? In this particular case, it seems that, well, first of all, all the factors are supported by substantial evidence. But there has to be – But let's assume that I don't agree with you. But if some of the factors are supported, how many factors would it be? Is it a number? Is it – what's the context? No, and I think this was addressed at length in the Colulu decision, this court's recent precedential decision in Colulu, that it's not a matter of balancing the findings that are not supported by the record against the findings that are. The scope of the inquiry is whether the record as a whole provides substantial evidence for at least one of the bases of the credibility determination. And in this case in particular, one of the bases was his criminal history, his misrepresentations of his identity to state and federal authorities. That is clearly supported by the record. A petitioner does not dispute his actions. And that in and of itself, even though it's only one of the factors identified by the agency, is more than substantial evidence supporting the credibility determination. So even if one factor – one of the findings is supported by the record, then that provides a basis for upholding the credibility determination based on substantial evidence review. There was also a discussion of the CAT claim, that the objective evidence in the record independently establishes his eligibility for CAT protection. And as we argued in our brief, that argument was not sufficiently developed in the opening brief. It had been waived by the petitioner. And the petitioner also does not point to any objective evidence in the record that compels reversal of the agency's decision that he did not establish, through objective evidence, a sufficient likelihood of torture for purposes of CAT protection. What do you make of the collateral attack on the removal order? If it – whether it's barred if he did not object to the reinstatement order? I mean, I guess that's – I was trying to understand how it could still survive. I'm sorry. I'm not sure that I understand the question. Right. So they didn't object to the reinstatement order. It's my understanding. So why are they then allowed to challenge, at this point, the removal order? Well, as we argue, they're not allowed to raise a – to challenge the removal order, because that's correct. There is no – there was nothing – after the notice of reinstatement was served by DHS, there was no objection. And I'm not entirely sure what the court's position is regarding exhaustion, if there is a need to exhaust an argument before DHS, before this court can entertain it. However, the crux is that the petitioner hasn't provided a basis for challenging the reinstatement order, that the regulatory prerequisites were met. DHS officer determined that the petitioner was subject to a final order of removal that was entered in 2017, that he had illegally reentered the United States after being removed. And that evidence provided the officer with a basis for reinstating the order of removal. And the statute limits a noncitizen's ability to challenge the reinstatement determination. And there is no meaningful challenge in that regard in this case. And Honduras is a country to which, under the statute, he's eligible to be sent. Correct. The reinstatement essentially reactivates the underlying removal order, which designates Honduras as the country of removal. This was pursuant to the petitioner's own designation of Honduras in his stipulation of removability, which was filed with the immigration judge in 2017. However, the agency is not limited to removing him to Honduras if there are complications in that process. The statute and the regulations provide for alternative countries of removal, depending on the circumstances, depending on whether there is some sort of connection between the petitioner and an alternate country. However, in this case, it doesn't appear that... So what would happen? Well, it's hypothetical at this point what will happen, but we can look at what happened in 2018, where the petitioner revealed his true name to the Honduran consulate, they issued travel documents, and he was removed. The credibility determination, based on that, the agency did not have to credit his testimony regarding what transpired after his removal, the alleged confrontations with the police that occurred upon his removal. That falls within the scope of the credibility determination, and so that aspect of his testimony does not have to be credited. But, again, the record reflects that he does have a connection, that he is considered a national of Honduras, that he has certain avenues for registering his identity, obtaining identification documents in Honduras, and that evidence suggests that he will be accepted by Honduras if and when he's removed there. I have one final question. What is his custody status? Is he still in detention? My understanding is that he is no longer in detention, although Petitioner's Council would be able to answer that question definitively. Thank you, Counselor. Your time has expired. We're hearing rebuttal now from Ms. Hong. Can you address that question? Is he still in detention? No, he's been released, Your Honor. I have three points. The Library of Congress letter is at page 399, and on the list of possible documents must be a sworn statement of paternity, which would be coming from the parent, and that's not available. It says at least two of those pertinent documents, and, you know, among the others are a vaccination card. And, again, the case law says the court can't speculate what's available. They have to show that it doesn't, that it actually exists. It also, on that list, is his birth certificate. Counsel said he did have a vaccination card. There's no proof of that, and what is required is, I mean, that list also has his birth certificate, which he doesn't have, baptismal records, which he doesn't have. The problem is that he doesn't have this documentation in his true name. At AR 378, the law also requires the involvement of the parents. The second point is that the government said that only Mr. Waterhouse's testimony says he could not get his documents in 2018. That is not true. The aunt's declaration at AR 377 confirms that they were not, that she was involved in that process in 2018 and ultimately was not successful in obtaining his registry of birth. The grandmother's declaration at AR 492 gives even more detail regarding her process both before he left the United States and then again in 2018 when they tried. Third, the Kumar case at 1153, to read from that, the BIA identified four factors involving its adverse credibility finding. In some we hold that most of the factors are not supported by the record, and then Kumar remanded in order. But Alam, I was at the center on the panel and Alam. And I appreciate that decision, Your Honor. I'm very aware of that. But Alam said you look at the totality of the circumstance. Yes. So you could have one ground that's really a killer and then three trivial ones. And so one could be enough in some cases, but sometimes they're all kind of a little bit weak and they work together, and then knocking out a few may send it back. So where does this fall in that kind of mix? Exactly. It's all mixed in together. And to Your Honor's first point about saying, well, he could register as an orphan, part of the IJ's adverse credibility is that she found it implausible that there was no way for him to register. And if it is pointed out that there's no showing that he could register as an orphan because we don't even know if he is an orphan, that is enough because if she has it out of her mind that actually there is no way for him to register, all the other document is seen in a new light. And under the REAL ID Act, it's the totality of circumstances that controls, and that is the remand that we are asking for. All right. Thank you, Counsel. Thank you. The case just argued will be submitted.
judges: COLLINS, VANDYKE, MENDOZA